Next case on the down is 517-0411, Chestnut v. Fast Eddies' Bon-Air, Inc. Okay. Counsel for Chestnut. Yes, ma'am. May I proceed when you're ready? Good morning, Your Honors. Good morning. May it please the Court? Ms. Billeritz? My name is Angie Zanzalotta, and I represent the appellants in this case, Cleta and George Chestnut. Appellants respectfully ask this Court to reverse the trial court's rulings on the following issues. First, the trial court erred in allowing the unilateral striking of portions of Dr. King's evidence deposition and allowing in attorney commentary. Second, the trial court erred in allowing the IPI 120-08 in as a jury instruction. That instruction improperly shifted the burden to plaintiff to disprove defendant's affirmative defense. Third, the trial court erred in denying plaintiff's motion eliminating No. 16 and overruling plaintiff's counsel's objection, which was continuing, on that same issue. Your Honors, what these three issues boil down to is whether or not Mr. and Mrs. Chestnut received a fair trial. I want to start with the IPI issue, if I could. Yes, Your Honor. That was tendered by plaintiff. That is correct, Your Honor. We had quite a lengthy jury conference discussion that was not on the record. We decided that we had no other choice but to tender the instruction, given the IPI and what it says. I believe Rule 239 says that the IPI shall be used. But if you thought that that was an incorrect statement of law, why tender it at all? We tendered it with an objection, and arguably with an alternative. I didn't see the objection in the record. Was there an objection on the record that you're tendering this with an objection? I believe when court came back on the record from the quite lengthy jury instruction conference, the court said both parties have a big dispute about this instruction. I saw that. And the court even agreed that he may or may not agree with the instruction, but it was above his pay grade. I saw that, too. And then we went to the clean ship of then tendering the instructions. But I didn't see that you intended it with an objection. I would agree with you, Your Honor, that I don't think there was a formal objection once it was tendered. Is that the way, then? I don't believe so. I believe that our objection in the hearing for the motion for new trial, we also, again, said we believe 120.08 was an improper instruction given the circumstances. And also the fact that when the court came back on the record from our jury conference, our jury instruction conference, the court said both parties are having lots of issues with this instruction, including defense counsel. But had you not tendered it, defense counsel would have, obviously. Or maybe not. Mr. Lance is a pretty seasoned trial attorney. I think he would have tendered it. And I think that it is in their advantage to tender that instruction. And in his closing argument, he did emphasize that instruction. But under the law, if you are, even if it is an IPI instruction and you don't think it is appropriate to your case, aren't you obligated to tender your own instruction, a modified instruction? Yes, Your Honor. Or waive it? Yes, Your Honor. And I believe that our alternative instruction was the negligence instruction. I'm sorry, I missed that. Your alternative instruction, what? Was the negligence instructions, which I believe were 15 and 16. You tendered everything. I just didn't understand that. So I don't know how it's not waived, even if you raise it later in your post-trial motion. So, I mean, do you have any authority that would say it wasn't waived? I do not, Your Honor. Offhand, I would say that I believe the comments on the record, saying that both parties had quite the issue with the instruction and that the comments during the hearing for the new trial, where we had again raised our objections to the instruction, would be sufficient. But I do understand Your Honor's concerns. With regard to, I'm going to skip around on you because we've all read the briefs, so I'd like to get some questions in if I could. With regard to Dr. King's deposition, can you tell me which commentary you're really complaining about? The attorney commentary? Yeah, I couldn't tell what was attorney. I mean, I saw one statement of attorney commentary, where I think it was commentary, where Mr. Laritz explained his definition of some medical meaning, but I wasn't even sure if that was commentary. There was records 606-7. 606-7? 606-7, yes, Your Honor, starting on 606. Now, again, it's important to note that this is the redirect. Mr. Laritz goes back and says he wants to read a question and answer. It's one question and answer, right? Correct. And he says, you didn't bring that to your deposition, did you? And Mr. Laritz says, answered no by Mr. Laritz, that was provided to you. That's attorney commentary? Yes. That was the attorney commentary? Yes. And that's the only attorney commentary that I suspected you were complaining about? Correct, Your Honor. One line? Correct. Now, when you read that one line, like we're reading it today and discussing, it does seem like it has very little prejudicial effect. When we were in the middle of trial reading the transcript back and forth, there was quite a bit of commotion around this line. And it highlights the fact that defense counsel was trying to indicate in a way that plaintiff's counsel was trying to deceive the jury. Now, it's important to note that with this transcript deposition, what we did was like, you know, any other trial. We went through and we stipulated certain things. We tried to work through the deductions as we could. I saw you did that before trial. Correct. You did from the jury trial conference. It seemed like perhaps plaintiff's counsel and Laritz had gone through, agreed on certain things, then the judge had to come in and make his last few objections, orders on those objections, and then this should have been an easy read. It should have been a very easy read, Your Honor. When we were going through it, we, you know, read it like a script. And then when Mr. Laritz did his cross-examination, or when Mr. Laritz did his direct examination, we offered to somebody play the doctor for Mr. Laritz to make it easier for him. He said he didn't want to, which was fine. What then happened was what I can only describe as a rapid-fire reading of the deposition transcript. Now, keep in mind that the original evidence transcript has been marked up to take out objections, mark out things that we've stipulated to be taken out. It was extremely confusing as to what Mr. Laritz was skipping, what he was reading. I tried very hard during that trial to read it silently to myself and catch things as I could, but it was extremely difficult. Now, if this was a video deposition, what would happen is we would edit it and press play. There would be no selective choosing of what was going to be read and what wasn't. Because in the whole, a transcript tells a story, and when you start taking bits and pieces out or you take them out of context, it changes the whole testimony, in my opinion. Well, unfortunately, the rule doesn't prevent that. Correct. From your perspective, it's unfortunate that the Supreme Court rules allow that kind of conduct, but they do. And from the record, it's hard for us to determine how speedy Mr. Laritz was. I understand. We can't do that. This is recording. But I didn't see where in rehabilitation there was that much for you all to read. Am I wrong about that, too? No, I don't think you're wrong about that. I think that we tried to catch what we could that was missed, and we tried to read those. I think being there in trial, a big issue was rather than defendant reading what was on direct examination like we expected, we were required then to go back and say, wait a minute, wait a minute. We want this included. And basically what we're telling the jury is, hey, hold on. This is good to us. We're going to read it. I think it really took away from the testimony of Dr. King and how the actual transcript read and what actually happened. Well, King was his witness. It was direct. Direct exam. Okay. I need to ask you about this topic because it's appearing over and over in this case. And that's where she fractures her wrists after the incident at Fast Eddie's. Yes, ma'am. Was that the subject of a motion in Limine? It was for the defendants. They tried to exclude that evidence. We kept it in because studies show, and I believe their expert testified to the fact that when you break a hip at that age, your balance issues are a lot worse than they were before. So it was our position that because she had those balance issues that she then fell. Her hip gave out kind of thing. And then she fell and then broke those wrists. Okay. So you didn't object to that coming in, the wrists? No, Your Honor. Because the way it's done in Dr. King's deposition and the way it's characterized is a little different than the way Mr. Laird's characterized it in his opening. Was there any evidence in King's deposition that it was done after she'd been at a casino or anything like that? I don't believe I understand your question. Did she break her wrists while walking her dog after she'd been at a casino? Well, she and her husband do travel and they frequent casinos, yes, ma'am. And what happened then is she was walking her small dog, her hip gave out, and she fell and hurt her wrists. Okay. The other thing about the deposition that I think you're trying to get at on the rehabilitation is, was he asked to bring records to his depo with a 237B notice? No. I'm sorry. Is that right, 237B? It was on the deposition. A notice of deposition, a 214 notice of deposition, did you ask him to bring stuff? Yes, Your Honor. And he didn't bring anything? Correct. And that was the point of your rehab is that Mr. Laird's wanted to tell the jury that you already had the documents. Right. But you wanted to show that he didn't bring anything that was asked of him, right? Well, to show that, yes, he did not bring what was requested of him. And when, on redirect, when Mr. Laird's then cited to that language what we're calling the attorney comments, it made it appear that we were deceiving the jury in some way. Because you already had the documents. Well, we had what Mr. Laird's gave us, correct. Right. You had what Mr. Laird's, but the doctor didn't comply with the notice. Correct. Okay. Third issue was, remind me again. The motion in limine. Talk to us about that if you would, please. Sure. So motion in limine number 16 discusses whether or not defendants should be allowed to say that they were compliant with all City of Alton building codes. The court at that time overruled our motion in limine and stated that they're going to give Mr. Laird's the chance to bring in witnesses, documents, to lay that foundation to say whether or not they did comply with what codes. So when the trial started, Mr. Laird's, in his opening, began with a statement about, hey, this restaurant is completely up to code, essentially was his statement. Mr. Wendler then made an objection, and he said, I would like a continuing objection based on the motion in limine number 16. The court said overruled. Throughout the trial, as it progressed, it became very clear to us that there were no documents that the defendant was going to present. The defendant merely presented their own employees, Mr. Scholler and his cousin Andrew Scholler, and they also presented a construction gentleman who owns construction company John Construction, who was responsible for building the outside area at issue. None of them cited particular codes. None of them knew, I don't believe, what the actual codes of the city of Baltimore were. They were unable to produce any kind of inspections. However, consistently they testified everything's up to code, people were in here constantly, the premises are, everything's fine. Everything was met on our end. Now, that gives the jury an unreasonable belief that we're talking about things like steps, lighting, handrails. The issue, we don't know whether or not the city vault came in and said this is good for a patio. This is fine for a patio. We don't know if the city vault came in and said the step needs to be painted, it's okay not to paint it. We don't know if the city came in and said something about the handrails. We don't know whether the city came in and said something about the lighting. The defense counsel consistently stated everything's up to code. So was there ever even a building permit put into evidence? No. No building permit? No, ma'am. It also looks like there was a Boykin objection, and for the record it's B-O-Y-K-I-N. You had a Boykin objection in this case that you went through with Dr. King? Correct. There was quite a bit of testimony excluded because Ms. Chesnut was in her 70s at the time of the fall, and she has plenty of health issues between diabetes and onwards. So that became an issue quite a bit in Dr. King's deposition, whether or not certain preexisting conditions could have caused her pain in her back, her hips, balance issues. Okay. Going back to this code, in their 213-F disclosures, we had a case on that this morning, did they inform you that Mr. June, is that his name? John. Did Mr. Simon, Mr. John, or Mr. Scholler were going to give opinions regarding codes or anything like that? I don't believe so, Your Honor. So their interrogatory answers didn't comply with 213-F? I would argue just like the case previously argued in front of the court, that Mr. Scholler and Mr. John could not even testify if they wanted to, to the fact of what the City of Alton's codes are and what type of inspections occur. This was a huge issue. Mr. Andrew Scholler, who actually does the day-to-day managing of FAS studies, had testified. He doesn't know what the codes are. He doesn't know where the permit paperwork is or the inspection paperwork is. He was pretty clueless on the topic. Were there objections placed on the record when they were testifying to these matters that you say were out of bounds? It is our opinion that our continuing objection at Record 41 was in place at that time concerning all testimony about the City of Alton codes and inspections. What kind of documentation, if any, was offered by these three people? Andrew, what's Mr. Scholler's first name, Your Honor? Eddie. Eddie. Of course. You can tell I'm not from Mexico. Or Mr. John? None that I can recall. I believe there may have been a blueprint entered at one point, but as far as any kind of permit paperwork, zoning paperwork, inspections, nothing. And all of this information, was that offered to prove the truth of the matter asserted? I believe so, yes. I believe that defense counsel's argument, and astutely so, was that if this patio is up to code with all these inspectors in the City of Alton and the government we trust, then it's up to code for you. There shouldn't be an issue here. However, that is an issue because we have no way of determining what was up to code, what was inspected, and what was at issue when those inspections were done. I would like to go back, Your Honor, if I could, to the 212C issue with the deposition. It's important to note that the court stated that it is the court's opinion that 212C is remedied merely by the fact that we can read into the record what we think was missed. We think that's at issue number one because the court has to uphold what's called a fairness standard under the rule. They have to determine whether or not it would be fair to omit the portions or allow further portions. We were at a disadvantage, and I know this court can't determine how quickly Mr. Lairds was reading or how much we were paying attention, on the other hand, but we were in a position where it was nearly impossible for us to correct what testimony was not put into the record. Secondly, Your Honor, I think when the attorney comment came in, it was allowed in without any kind of need for a modification, clarification, or explanation, which is required under 212C. The judge just merely stated in front of the jury, the jury will understand, don't worry about it. Given the commotion, what was going on, the jury was clearly keen on what was going on, what we were, you know, discussing. So I think that they put a lot of weight onto just that one statement. You don't think they put more weight on the fact that the defense lawyer was saying there's all these kinds of codes and all these people testified to codes and then you didn't have any codes? I think that the jury put a huge amount of weight onto that testimony because I, as a layperson, know if somebody was telling me that same statement, I would put a ton of weight onto that. I would think I trust the government, the government knows what it's doing, okay. Everything was up to snuff. And that's a huge issue. Did the court actually say that it was going to allow Mr. Laritz the opportunity to lay the foundation for that information would come in? From my recollection, that was the holding of the court, that the court was not going to deny the motion in limine without allowing Mr. Laritz the opportunity to at least present witnesses and documents. You may disperse. Thank you, Your Honor. Overall, Your Honor, I believe these three issues between the jury instruction, the reading of Dr. King's supposition warrants reversal in our favor. Thank you. Thank you. Mr. Laritz. Good morning. Good morning. Good morning. Okay, please, the court. Let me address first the issue of the instruction. Nobody, the plaintiffs did not tender an alternative instruction. I guess maybe they're saying since 120.08 does not apply, maybe 20.01 applies, the general negligence instruction. They never made that argument. That number was never presented to the judge. No such instruction was presented to the judge. All the judge, what is the judge to do? All the judge can do when he's handed an instruction and told this is our instruction. We don't have any other. This is what we want you to give. How can it be error for the judge to give that instruction? That would put the judge in a terrible spot. Now, if there's something wrong with 120.08, if it doesn't properly present the law to the jury, the way to do it is to draft law that does, present it to the judge and say, Judge, this is what you need to do. Under those circumstances, this court or the Supreme Court can look at the instruction that's presented and decide whether 120.08 needs to be changed. But that isn't the case here. Okay, so let's talk about your opening statement and the motion to eliminate. Yes. Is it true that the court said it was going to allow you the opportunity to present a foundation for the codes? Of course. So did you ever intend to have any documentation that would show a building permit, an approval by the city vault, and did you ever have that in your pocket when you opened this case? No. Do you know that it's error for an attorney to represent an opening statement, evidence that he knows or she knows they do not have? With all due respect, Your Honor, that's not what I said. Well, you in your opening statement said that the city of Alton was there continuously, that you were going to produce witnesses that said there was compliance with all the codes of the city of Alton. Did you not say that? I did, but I said that. You said that, and you had absolutely no evidence. You knew you were not going to have any evidence that there was that kind of approval by the city of Alton. Isn't that true? No, Judge, I'm sorry. Tell me what you had that showed you had any evidence of approval of a code by the city of Alton. First of all, Judge, I made this. Please answer my question. Mr. John, P.J. John, was a contractor with 40 years' experience in Madison County, built many, many buildings all around, extremely experienced, with a very reputable building company, now retired. And he was the man who said, I built this, I dealt with the city of Alton. The inspectors came out, they passed it off. Really? And where was the proof of that, other than the hearsay of Mr. John? Judge, this building— Did you have any proof? Did you put in any codes, anything like that, even a building permit? No, I did not. So you knew going into this trial that even Mr. John, who you asked if he built this according to code, what's he going to say, no? You knew that he had nothing to rely on in his testimony, right? Only his 40 years' experience building in Alton. Yeah, but you specifically represented to the court and an opening statement to the jury that you were going to show that the city of Alton codes, I'm using your language, were complied with. And I did. What code? Tell me what code you complied with. What is it? What ordinance number, what zoning code? I don't know that. Precisely. Yes. So may I explain myself? Yes, you may, of course. First of all, they have a safety expert who's got codes and standards of all kinds. There's all kinds of standards for stairs. You know that. You've been a lawyer a long time. So what about your information? So they have a safety expert who has codes and standards of all kinds, who said this construction didn't comply with this code, that code, or the other code. And I said, did it comply with the Alton building codes? And he said yes. But more importantly, Judge, there was no objection in this entire trial to any evidence about Alton building codes, not one. There was a motion in limine, sir. There was not. You don't think that's an objection? Judge, you know that a denial of a motion in limine is a non-event for an appeal. It's a non-event. It does nothing. It's purely interlocutory. I understand. But it's an attempt by one party to prevent the introduction of certain kinds of evidence. And there's at least a reference by the judge that he was allowing a continuing objection as to this kind of testimony. I don't think that's what the judge said. Mr. Wendler said, in my opening statement, when I said their building expert, their safety expert, says that it didn't comply with all these codes, but it complied with the Alton City codes, Mr. Wendler objected and said, I would like a continuing objection. And Judge Mudge said, overruled. What that means to Mr. Wendler is, if I try to get in evidence of a code or anything else and he doesn't like it, he's got to object. And he's got to give Judge Mudge an opportunity to rule on it then. Otherwise, what have we got? What have we got without an objection? What is Judge Mudge supposed to do? And that's what we're here about, convicting Judge Mudge of error. Not me. Not my trial being error. Well, it seems to me that your conduct in this trial was to intentionally try to violate certain rules like the Boykin order that was entered when you asked about her prior health. And there was a sidebar that at least probably instructed you to stop doing that because, of course, you didn't go back to that question. I'm sorry, Judge. I take issue with that statement. You did not answer it? No, I did not drop it intentionally. You weren't in perfect health before this accident happened and there was an objection and a sidebar on that? You don't remember that? I do remember that. Judge, there's objections all the time. Okay, but that was pursuant to a board decision. And you can judge who sustains them or denies them. And there had to be a sidebar on that because of your question. Well, I'm sorry, Judge. If there has to be a sidebar, then I guess I've committed error in every trial I've ever been in because... Well, I don't know about any other trials and I'm not here to ask you questions about any trials. I'm trying to find out whether this was a fair trial. That's all. Well, I think it was. I think Judge Mudge did an excellent job of conducting this trial. Did you in your 213 disclosures indicate what these people were going to testify to with regard to codes? I don't remember, Judge. To tell you the truth, and that wasn't raised in the brief or the new trial motion, so I haven't really looked at it. Well, in your opening statement, you said that now you're going to hear Larratt's safety rules. Larratt's safety rules, and this is what the law says. You have to keep a lookout for your own safety. Another of Larratt's safety rules is don't back up without looking. How is that opening statement? Is that argument or opening statement, sir? I don't know, Judge, but it certainly wasn't objected to, and it certainly is not in the brief, and I didn't know I was going to be questioned on that, too. Well, I'm just wondering about the motion in Lemonade. Again, I'm talking about codes and rules and safety standards. The ASTM standards are not necessarily ordinance violations or safety codes, right? That's correct. You know the difference. You said the evidence would be there was no fault on the part of Bastetti's and John Construction because the city of Alton did everything right in constructing this patio, and the city of Alton did everything right. I guess that's a mistake. It's up to them why the city of Alton was right there with them. I guess that's a mistake, Judge. I probably meant to say that the construction company did everything right, and you know what? That's probably not the only time in that trial I made a misstatement. Well, you know, I'm just wondering. It seems to me that when you're talking to a jury in an opening statement and you know that there's no evidence that you have to put on in your case of any codes, rules, regulations, you didn't have an expert, it seems to me that the law says that you cannot put into opening statements something you know you know you cannot prove. Judge, I disagree. I had an expert. I had Mr. John who's more experienced with construction in Alton than possibly anybody around, and he got up and he said the city of Alton inspected this and it passed all the codes. This is in rebuttal of their expert who says it didn't pass this code, it didn't pass that code, it didn't pass all those codes. He was not talking about city of Alton code, some nebulous thing that you didn't prove. Yes. And anybody who was welcome to go to city hall, get a copy of that code, show it to the jury and say this code doesn't apply. Well, you certainly didn't do that, although you're the one that brought it up. Well, couldn't they have done the same, done that? We're not here to talk about their conduct. I'm asking about your conduct in this case. Judge, you know, there was no objection is all I can tell you. If there had been an objection and the judge had ruled on it, I would have complied with it. But since there's no objection, you're trying to convict me of doing things which weren't objected to and which the judge allowed me to. Well, there was an objection during opening statement. There was a motion in limine, right? So the objection in opening statement stands in that you were talking about codes that you never intended to prove. So, therefore, we do have a valid objection done during opening statement, right? No, Judge, I disagree. I think every time that somebody wants to put in some evidence that you object to or you don't think is proper, you have to object then and there before the trial judge to give that judge an opportunity to rule on the objection, to determine whether a proper foundation has been laid, to determine whether it's relevant to any issue, and to just say, well, I can object once in opening statement and that's good for the rest of the trial. How is a judge supposed to handle that? Well, let me ask you this. Do you think the law in Illinois has or recognizes continuing objections? Yes. Okay. So what do you think their continuing objection referred to, if not the motion in limine? And it came up when you were talking about the codes in your opening statement. What was their continuing objection? It was vague, to tell you the truth, and I don't know exactly what it was all about. And he never, and the judge did not say, okay, I'm giving you a continuing objection. That evidence has to stay out. I was never told that. And so without a grant, granting a continuing objection to tell me what I can and cannot get into, how can I be at fault? But isn't that why we're here, Mr. Leritz, to determine whether that ruling by the court was error? Isn't that why we're actually here? No. No, because the brief says, their brief says they are stating that the trial court erred in failing to grant the motion in limine. Not in letting in this evidence or that evidence or that evidence. But the motion in limine refers to this, what we're talking about, those codes. And there was an objection during oral argument, and they asked for a continuing objection, and the judge made some vague reference to overruled. He didn't say sustained. You know, I don't know what that really means. The question is whether the trial in light of the motion in limine and the continuing objection, so to speak, was or was not fair. Did the court make the right decision? Judge, what's fair is when somebody follows proper trial procedure. Correct. And asks for and gives an objection, makes an objection when evidence is coming in. And to not make an objection and then complain later that that evidence came in puts not only me but Judge March in a terrible position. How can he win? How can Judge March handle that? A motion in limine preserves, a denial of a motion in limine preserves nothing. That's elemental. Everybody knows that. And so when Judge March says, I'm going to deny that motion because what all judges want is to see what the evidence is going to be. When he says, I'm going to deny that motion, then it's incumbent upon them to make proper objections. And if I hadn't made proper objections and evidence had come in, I wouldn't be here complaining about it. And as a matter of fact, they made not a single objection to any evidence about a building code. And so now they're in here complaining about it. That's not how it works, Judge. I did what I could with what the objections were. I certainly did. And I followed all of Judge March's rulings and directives completely. You can proceed with your argument. Thank you. The 212 issue. You still haven't been told by the plaintiffs what evidence I didn't read into the record, which prejudiced them so highly, which they needed to get into the record. They never asked Judge March, great judge, under Rule 212c, we'd like to read such and such, in which case I would have said, fine. And Judge March would have said, fine, read whatever you want. You know, I cut out evidence of things that aren't in dispute. For instance, as they say in their brief, causation evidence. There's no question that falling and hitting the concrete at Fast Eddie's is what caused the broken hip. I'm not going to get into all that. And why should I waste the juror's time and why should I waste the judge's time reading things that aren't at issue? So I go to what is at issue. Did you stipulate the causation during trial? I don't remember, to tell you the truth, Judge. So if it's not, did you admit it in your pleadings? No, I didn't admit it in the pleadings. You denied it? I probably just denied everything, to tell you the truth. So it was an issue. It was an issue of causation. Right, but I wasn't going to make... Not in your mind, but it was an issue. But I wasn't going to make a big deal out of it because... Of course not, because then the jury finds causation. Right, and everybody knows that. Everybody knows she broke her hip when she fell at Fast Eddie's. That's just not an issue, Judge. And so am I going to get up there? Would you expect me then to get up there and hammer on causation when it's worthless? You can't hammer anything. All you can do is read. Right, so I can read what I want. And if I read something and they want me to read something else, they can say to the judge, Hey, Judge, what about page 47? And they never did. And now they're complaining that somehow because I read too fast, there were two lawyers on that side sitting in the courtroom. Because I read too fast, they couldn't keep up with what I was doing. If they wanted to, they could have re-read the whole thing. I'm sure Judge Mudge would have let them do that. Or any portion of the deposition that I didn't read. I see no problem with that. But again, there was no request made to Judge Mudge. So now we're going to try to convict Judge Mudge of error for not doing something that they never asked him to do. I can't imagine how Judge Mudge could be in error for that. In fact, I can't imagine how Judge Mudge can be in error for any of the three things that they have raised in their brief. They didn't raise any discovery violations in their brief. I put Mr. John in as an expert, saying he was going to testify about the building. That was never raised in their brief. All they've got is the motion in limine, and they never objected to that evidence. They've got the instruction, which they clearly waived by not submitting an alternative, and actually by submitting the very instruction that the judge gave. And the third one was... Well, that's it. So none of these things, Judge. Going back to the code, Mr. Laird, you represented an opening statement that the code of the city of Alton, the code that applies here, didn't require any of those things, paint, lighting. You're talking about their expert. Again, I want to know what code you were talking about that did or did not require anything. The Alton City Code. And you put it into evidence. I did not. Did anybody? Nobody did. So the three issues that they have raised, as far as I'm concerned, Judge Mudge handled them all properly. There was no other way he could have handled them. There were no objections made. There were no requests made. There were no alternatives submitted. Under these circumstances, I submit to the justices that there is no way that Judge Mudge should be reversed in this case. There was a fair trial. Everybody did what they could. Judge Mudge was very attentive. If you read the record, you can see, and none of the things that they complained about constitute reversible error. Thank you very much. Thank you. Okay. Is there any rebuttal? How do you pronounce your name again? Zunzaleta. Zunzaleta. Yes, ma'am. Your Honor, number one, I'd like to address the issue of whether or not having the code or alluding to the code was objected to. In opening statements, Mr. Laird says, the code that applies here didn't require any of those things. And Mr. Wendler objects. Your Honor, for the record, could I show my objection as referenced in the motion of limine, the continuing objection? The court says overruled. Mr. Laird goes on to talk more about the code, gun instruction. And at one point, Mr. Laird, in the opening, says, and when the construction was done, the city gave them a permit and said, you can occupy this, you can use this. There were no code or safety violations. The record does not indicate that. Mr. Laird produced no evidence indicating such. In fact, his own witnesses, Mr. Andrew Scholler, said he had no idea about the code or where any of this stuff was. As Justice Gates astutely pointed out, what was gun construction to say? No, I built a building and it wasn't up to code. It's also our position that they were not, gun instruction, Mr. Gun, was not disclosed as a 213 expert witness. I don't recall that happening at all in this case. Even if he were, he is not, of course, a man who can testify as to what the city of Elkhorn code was when inspections were done, et cetera. I believe we objected. Were any hearsay objections made during the trial for this? No, Your Honor. Why not? Because I believe that the motion of limine number 16 and the continuing objection on record 41 was encompassing this issue. Now, despite the fact that Mr. Laird says we did not object, I believe we objected. This court has the power and has the obligation to reverse plain error. Plain error protests rights of the party and integrity and reputation of the judicial process. If Mr. Laird is allowed to go up there in front of a jury and say, I'm going to show you A, B, and C, and preaches it throughout the trial, preaches it through his closing and never provides that evidence, then what is the integrity of our judicial system at that point? The point of a jury is not to judge. Did you raise plain error in your brief? I did not, Your Honor, because I believe we did object to the issue. So you think plain error could apply here? Yes. I think what you're referring to is that we can reverse on any issue that's in the record, right? Correct. Yes, Your Honor. Well, that's for us. I'm not sure that we can allow you to argue plain error on rebuttal without notice to Mr. Laird. Fair enough. Thank you. Okay. Mr. Laird says that any party could have gone to the city hall and gotten these permits. I believe that statement is flawed in a very many perspectives. The first perspective is that it was not our argument that they were in compliance with everything. That was not our burden to prove. It was Mr. Laird's. Mr. Laird's never introduced any kind of code, paperwork, witness, or anything. He was there to testify that inspections were done, code safety was up to par, and everything was going according to the Alton City Code. Now, Mr. Laird says that we did not attempt to read what was left out of the transcript. If you read the record, it is clear that we tried our best to go back and read what portions of the testimony were omitted in regards to the 212C issue. So I believe that given what 212C requires, the Fairness Doctrine, that the court must look at it and decide whether or not statements taken out of context, whether they clarify, modify, or explain. What's going on here is when we're picking and choosing and going back and rereading issues, especially when plaintiff's counsel is rereading direct examination of defense counsel and improperly turns the jury's attention to something that plaintiff's counsel says, this is good for us, we're going to go ahead and read it, is essentially what we're telling the jury. I think that comes off as very disingenuous to a jury, and I think it definitely prejudiced their opinion. In this case, Your Honor, given the code issue Motion to Eliminate 16, the Rule 212C issue and the Jury Instruction 12008, I think it's clear from the record that the Chesnuts did not receive a fair trial. We would ask that this court reverse the Madison County Circuit Court and remand for a new trial. If there are no further questions, thank you very much for your time. Thank you. Thank you, counsel, for your evidence. This matter will be taken under advisement. This position will be issued in due course. Thank you.